## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ALTA WATERFORD, LLC, an Illinois Foreign Corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL NEW ENERGY HOLDING GROUP, INC., a Nevada Corporation,<br><br>Defendant. | Case No.  25-cv-14696<br><br>JURY DEMANDED |
| UNIVERSAL NEW ENERGY HOLDING GROUP, INC., formerly known as Fastbase, Inc.<br><br>Third-Party Plaintiff,<br><br>v.<br><br>RASMUS REFER, Individually,<br><br>Third-Party Defendant. | |

## DEFENDANT'S ANSWER TO COMPLAINT,
## AFFIRMATIVE DEFENSE AND THIRD PARTY COMPLAINT

NOW COMES Defendant, UNIVERSAL NEW ENERGY HOLDING GROUP, INC., ("UNEH"), by and through its attorneys, Vincent T. Borst and Latimer LeVay Fyock LLC, and for its Answer to Plaintiff, Alta Waterford, LLC's ("Alta") Complaint,  states as follows:

### PARTIES

1.      Plaintiff, Alta Waterford, LLC, is an Illinois foreign corporation and a citizen of St. Kitts & Nevis and maintains its principal place of business at Hunkins Plaza, Charlestown, St. Kitts & Nevis and is engaged generally in the delivery of investor relations and marketing services.

**ANSWER:** **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 1 of the Complaint, and therefore neither admits or denies same.**

2.      Plaintiff is informed and believes, and thereon alleges, that Defendant UNIVERSAL NEW ENERGY HOLDING GROUP, INC. (hereinafter referred to as "UNEH"), is a Nevada corporation and maintains its principal place of business 1980 Festival Plaza Drive, Suite 300, Las Vegas, NV 89135 and is a publicly traded company that generally require the services of Plaintiff.

**ANSWER:** **UNEH admits that it is a Nevada corporation that maintains its principal place of business at 7771 Alder Forest St., Las Vegas, NV 89113. UNEH denies the remaining allegations in Paragraph 2 of the Complaint.**

## JURISDICTION AND VENUE

3.      This Court has jurisdiction because the Plaintiff is registered to do business in Illinois and pursuant to the contract described herein below, Defendant UNEH agreed that the contract would be governed by the laws of the State of Illinois.  In addition, the agreement provides, in pertinent part, as follows: "Each party hereby unconditionally and irrevocably waives, to the fullest extent permitted by law, any claim to assert that the law of any jurisdiction other than the State of Illinois governs this Agreement.  All disputes, controversies, or claims arising out of, or in connection with, this Agreement shall be litigated in any state or federal court in Illinois."  Venue is proper in Cook County, Illinois because the Plaintiff maintains its principal office in Chicago, Illinois.

**ANSWER**:    **UNEH denies that a valid contract exists between itself and Plaintiff. UNEH admits jurisdiction and venue are appropriate in this Court**

**ALLEGATIONS OF FACT**

4.      The Defendant owe Plaintiff at least $202,250.00.

**ANSWER**:      **UNEH denies the allegation in Paragraph 4 of the Complaint.**

5.      On or about January 4, 2023, the Defendant agreed in a written contract (hereinafter referred to as a "Agreement") to pay Plaintiff for investor relations services and to generally increase the liquidity of trading volume in the Defendant's stock.  A true and correct copy of the Agreement is attached hereto as Exhibit "1" and incorporated herein by reference.

**ANSWER**:      **UNEH denies the allegations in Paragraph 5 of the Complaint.**

6.      The Agreement was effective on March 13, 2023.

**ANSWER**:      **UNEH denies the allegations in Paragraph 6 of the Complaint.**

7.      At the time of executing the Agreement, Defendant was named, FASTBASE INC.

**ANSWER**:      **UNEH denies that FASTBASE, INC. executed the Agreement, but admits the remaining allegations in Paragraph 7 of the Complaint.**

8.      Defendant changed its name to UNIVERSAL NEW ENERGY HOLDING GROUP, INC. on June 19, 2024.  *See* Nevada corporate record attached hereto as Exhibit "2".

**ANSWER**:      **UNEH admits the allegations in Paragraph 8 of the Complaint.**

9.      Plaintiff has developed and nurtured a list of investment newsletter subscribers that typically invest in small cap stocks.

**ANSWER**:      **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 9 of the Complaint, and therefore neither admits or denies same.**

10.      Plaintiff's list of subscribers is valuable to publicly traded companies like the Defendant.

3

**ANSWER**:    **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 10 of the Complaint, and therefore neither admits or denies same.**

11.    Plaintiff performed the investor relations services agreed to in the contract by disseminating UNEH's news releases to Plaintiff's list of subscribers to Plaintiff's investment newsletters.

**ANSWER**:    **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 11 of the Complaint, and therefore neither admits or denies same.**

12.    Plaintiff performed by implementing and executing an email campaign to Plaintiff's subscribers.

**ANSWER**:    **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 12 of the Complaint, and therefore neither admits or denies same.**

13.    The Plaintiff committed in the contract that $30,000 of trading liquidity would be generated during the campaign and achieved this goal on or about January 30, 2024.

**ANSWER**:    **UNEH denies that FASTBASE, INC. executed the Agreement and therefore denies the allegations in Paragraph 13 of the Complaint.**

14.    Plaintiff performed the investor relations services agreed to in the contract and invoiced the Defendant in the amount of $5,000.00 for the work performed.

**ANSWER**:    **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 of the Complaint, and therefore neither admits or denies same.**

15.    Section 28 of the Agreement provides that trading liquidity generated beyond $30,000.00 would "rollover" and begin a new contract under the same terms.

**ANSWER**:    **UNEH denies that FASTBASE, INC. executed the Agreement and therefore denies the allegations in Paragraph 15 of the Complaint.**

16.    The "rollover" provision recognizes that Plaintiff's campaign generates investor interest that is hard to predict and continues to accrue benefits to customers beyond the initial campaign goals.

**ANSWER**:    **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 16 of the Complaint, and therefore neither admits or denies same.**

17.    Plaintiff also continues to promote customers after the initial campaign in its newsletters.

**ANSWER**:    **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17 of the Complaint, and therefore neither admits or denies same.**

18.    As of August 30, 2024, Plaintiff generated over $221,182.77 of additional liquidity beyond the initial campaign, which equates to 7 "rollover" contracts ("campaigns"). The amount owing under these 7 contracts is $35,000.00.

**ANSWER**:  **UNEH denies that FASTBASE, INC. executed the Agreement and therefore denies the allegations in Paragraph 18 of the Complaint.**

19.     The Defendant had a full understanding of the additional "rollover" campaigns.

**ANSWER**:     **UNEH denies the allegations in Paragraph 19 of the Complaint.**

20.     Customers may terminate the "rollover" campaigns by giving five days' notice to Alta Waterford.

**ANSWER**:  **UNEH denies that FASTBASE, INC. executed the Agreement and therefore denies the allegations in Paragraph 20 of the Complaint.**

21.     The Defendant has not provided any termination notice under the terms of original Agreement.

**ANSWER**:  **UNEH denies that FASTBASE INC executed the Agreement and therefore denies the allegations in Paragraph 21 of the Complaint.**

22.     Section 9 of the Agreement provides for a daily penalty of $250.00 if payment is not received after five days.  As of November 9, 2025, the total penalty amount was $162,250.00.

**ANSWER**:  **UNEH denies that FASTBASE INC executed the Agreement and therefore denies the allegations  in Paragraph 22 of the Complaint.**

23.     Section 20 of the Agreement provides for attorney's fees for collection, specifically that "the Customer shall reimburse the Service Provider upon demand for any legal fees and court (or other administrative proceeding such as arbitration) costs or expenses that the Service Provider incurs in connection with the breach or default, regardless whether suit is commenced or judgment entered.  Such costs shall include legal fees, including contingency based attorney's fees at the rate

6

in Service Provider's attorney fee agreement, and costs incurred in the negotiation of a settlement, enforcement of rights, litigation expenses or otherwise."

**ANSWER**: **UNEH denies that FASTBASE, INC. executed the Agreement and therefore denies the allegations in Paragraph 23 of the Complaint.**

24. The Defendant has not paid Plaintiff even after multiple demands. A true and correct copy of the latest demand for payment is attached hereto as Exhibit "3" and incorporated herein by reference.

**ANSWER**: **UNEH admits the allegations in Paragraph 24 of the Complaint, and answering further states that it had no obligation to make any such payments.**

### COUNT I – BREACH OF CONTRACT

25. Plaintiff repeats and realleges paragraphs 1 through 24 as if fully set forth herein.

**ANSWER**: **UNEH realleges and reasserts its answers to Paragraphs 1 through 24 as though fully set forth herein as its answer to Paragraph 25 of the Complaint.**

26. Plaintiff offered to perform services to the Defendant.

**ANSWER**: **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegation set forth in Paragraph 26 of the Complaint and therefore neither admits or denies same.**

27. The Defendant agreed to and accepted the terms of the offer and agreed to pay the Plaintiff for its services.

**ANSWER**: **UNEH denies that FASTBASE, INC. executed the Agreement and therefore denies the allegations in Paragraph 27 of the Complaint.**

28. The parties entered into a written contract by signing the Agreement.

7

**ANSWER**: **UNEH denies that FASTBASE, INC. executed the Agreement and therefore denies the allegations in Paragraph 28 of the Complaint.**

29.    The Defendant refused and failed to pay Plaintiff in breach of the contract.

**ANSWER**: **UNEH admits that it has not paid Plaintiff, and answering further states that it had no obligation to make any payment to Plaintiff.**

### COUNT II – ACCOUNT STATED

30.    Plaintiff repeats and realleges paragraphs 1 through 24 as if fully set forth herein.

**ANSWER**: **UNEH realleges and reasserts its answers to Paragraphs 1 through 24 as though fully set forth herein as its answer to Paragraph 30 of the Complaint.**

31.    The Defendant received a statement of account of outstanding invoices from the Plaintiff for work Plaintiff performed.

**ANSWER**: **UNEH admits that it received a statement but denies that it related to any work performed pursuant to a valid agreement.**

32.    Plaintiff's attorney sent a demand for the account balance by email on October 10, 2024.

**ANSWER**: **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 32 of the Complaint, and therefore neither admits or denies same.**

33.    Defendant retained the account beyond a reasonable time without objection constitution a recognition of the correctness of the account and establishing an account stated.

**ANSWER**: **UNEH denies the allegations in Paragraph 33 of the Complaint.**

8

34.     This retention without objection implies assent to the account.

**ANSWER**:     **UNEH denies the allegations in Paragraph 34 of the Complaint.**

35.     The Plaintiff made multiple demands for payment.

**ANSWER**:     **UNEH is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35 of the Complaint, and therefore neither admits or denies same.**

36.     The Defendant has not paid the Plaintiff.

**ANSWER**:     **UNEH admits the allegation in Paragraph 36 of the Complaint, and answering further states that it had no obligations to make any such payment.**

**WHEREFORE** Defendant Universal New Energy Holding Group, Inc. respectfully requests that judgment be entered in its favor and against Plaintiff Alta Waterford LLC on its Complaint, awarding Defendant its attorneys' fees, costs and such other relief as this Court deems just.

## AFFIRMATIVE DEFENSE

Upon information and belief, the signatures on the document attached as Exhibit 1 to the Complaint that purport to be that of Rasmus Refer were fraudulent and unauthorized, and forged without his knowledge or permission.

## THIRD PARTY COMPLAINT

NOW COMES UNIVERSAL NEW ENERGY HOLDING GROUP, INC., formerly known as Fastbase, Inc., by and through its attorneys, Vincent T. Borst and Latimer LeVay Fyock LLC, and for its Third Party Complaint, states as follows:

9

## PARTIES

37.     Universal New Energy Holding Group, Inc., formerly known as Fastbase, Inc. ("UNEH") is a Nevada corporation that maintains its principal place of business at 7771 Alder Forest Street, Las Vegas, Nevada 89139.

38.     Third-Party Defendant Rasmus Refer ("Refer") is a foreign national and not a resident of the United States residing at Gamle Carlsberg VEJ16, 2500 Valby, Denmark.

## JURISDICTION AND VENUE

39.     Jurisdiction over UNEH's Third Party Complaint is appropriate according to 28 U.S.C. §1332(a)(3) because this matter is between citizens of different states and in which citizens or subjects of a foreign state are additional parties.

40.     Venue over UNEH's Third Party Complaint in this Court is appropriate according to 28 U.S.C. §1391(c)(3) because Refer is not a resident of the United States and may be sued in any judicial district.

## FACTS

41.     On or about January 17, 2024, Refer and UNEH entered into a Stock Purchase Agreement ("SPA"), a true and correct copy of which is attached to this Third Party Complaint as **Exhibit 1**.

42.     Pursuant to the terms of the SPA, Refer represented, warranted and coveted to UNEH that UNEH would not, as of the closing, have any debt, liability, or obligation of any nature, whether accrued, absolute, contingent, or otherwise that would not be paid, cancelled or forgiven at the closing unless agreed to by the parties in writing.

[Exhibit 1, ¶ 2.08]

43.    Refer further represented, warranted and coveted to UNEH that:

"To the best of knowledge of [Refer], neither [Refer] nor the Company is a party to any direct and/or indirect litigation, arbitration and/or other proceedings and [Refer or the Company] is not aware of any pending, threatened or asserted claims, lawsuits or contingencies involving [Refer and the Company] or any of their respective assets, including without limitation, in the case of [Refer] and the Shares. There is no dispute of any kind between [Refer and the Company] and any third party.  Neither [Refer] nor the Company is party to any suit, action, arbitration, or legal administrative or other proceeding, or pending governmental investigation. To the best of knowledge of [Refer and the Company], there is no basis for any such action or proceeding and no such action or proceeding is threatened against [Refer] and/or the Company.  [Neither Refer] nor the Company is a party to or in default with respect to any order, writ, injunction, or decree of any federal, state, local, or foreign court, department, agency, or instrumentality."

[Exhibit 1, ¶ 2.09]

44. Refer further agreed as follows:

"From and after the Closing, [Refer] agrees to indemnify [UNEH] and [UNEH] agrees to indemnify [Refer], against all actual losses, damages and expenses caused by (a) any material breach of this SPA by the indemnifying Party or any material misrepresentation by the indemnifying Party; or (b) any misstatement of a material fact or omission to state a material fact by the indemnifying Party required to be stated herein or necessary to make the statements herein not misleading."

[Exhibit 1, ¶ 5.01]

45.    UNEH has denied the existence of any liability to Plaintiff Alta in the underlying Complaint out of which this Third Party Complaint arises.

46.    However, the allegations by Alta in the underlying Complaint make it clear that Refer may have breached his representations, warranties, and covenants to UNEH by virtue of the alleged existence of the contract alleged in the underlying Complaint in this matter.

47.    As a result, UNEH is entitled to defense and indemnification, and payment for any attorneys' fees, costs, damages, awards, judgments, and other damages arising from the underlying Complaint.

11

**WHEREFORE**, Third-Party Plaintiff Universal New Energy Holding Group, Inc., respectfully requests that this Court enter judgment in its favor and against Rasmus Refer on the Third Party Complaint awarding UNEH judgment as follows:

1.    Finding that UNEH is entitled to defense and indemnification from Refer for any judgment, costs, expenses or damages arising out Plaintiff's Complaint;

2.    Awarding UNEH, its attorneys' fees and costs incurred in this matter; and

3.    Awarding UNEH such and other relief as this Court deems just.

Respectfully submitted,

**UNIVERSAL NEW ENERGY
HOLDING GROUP, INC.**

By: _____

One of Its Attorneys

Vincent T. Borst (ARDC 6192904)
LATIMER LEVAY FYOCK LLC
*Counsel for Universal New Energy Holding, Group, Inc.*
55 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 422-8000
vborst@llflegal.com

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned non-attorney, certify that on December 29, 2025, I electronically filed the foregoing ***Defendant's Answer to Complaint, Affirmative Defense, and Third Party Complaint*** with the Clerk of the Court using the CM/ECF system, which will serve same upon the below listed individual via electronic mail:

George W. Svoboda
The Law Office of George W. Svoboda
P.O. Box 1299
McHenry, Illinois 60051
george@georgesvobodalaw.com

/s/ Nidia Laureano
Latimer LeVay Fyock LLC
4917-3028-8770, v. 1 (36640-0001)

13

# EXHIBIT 1

# STOCK PURCHASE AGREEMENT

THIS **STOCK PURCHASE AGREEMENT** (the "SPA") is made this 17th day of January, 2024, by and among Rasmus Refer, an individual (the "Seller") and the controlling shareholder of Fastbase Inc., Nevada corporation (the "Company" or "FBSE"), and Chong Yi Yang, or his Assigns (the "Purchaser"), setting forth the terms and conditions upon which the Seller will sell a total of Seventy-nine Million, Nine-Hundred Sixty-six Thousand, Nine Hundred and Sixty-one (79,966,961) shares of the Company's Common Stock, owned by him and representing approximately seventy-four percent (73.8%) of the issued and outstanding common stock of the Company (the "Shares"), to the Purchaser. The Seller and the Purchaser may be referred to herein singularly as a "Party" and collectively, as the "Parties".

In consideration of the mutual promises, covenants, and representations contained herein, THE PARTIES HERETO AGREE AS FOLLOWS:

## WITNESSETH:

WHEREAS, the Seller and the Purchaser have appointed David L. Hill, II on behalf of Hill Innovative Law, LLC, to act as the Escrow Agent ("Escrow Agent") for this transaction and to receive and hold all consideration received from the Purchaser for the sale of the Shares and all documents, stock certificates, medallion signature guaranteed stock powers and corporate records of the Company to be delivered by the Seller and the Company to the Purchaser hereunder (collectively, **"Documents"**), in the Escrow Agent's account, as defined in the Escrow Agreement (the "Escrow Account"), unless other arrangements are agreed to by all parties.

WHEREAS, the Purchaser, the Seller and Escrow Agent, have entered into an ESCROW AGREEMENT dated January 17, 2024.

NOW THEREFORE, in consideration of the mutual promises, covenants and representations contained herein, the parties herewith agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF THE SHARES

1.01 <u>Sale</u>. Subject to the terms and conditions of this SPA, the Seller agrees to sell the Shares and the Purchaser shall purchase the Shares, for a total of Two Hundred and Fifty-Five Thousand U.S. dollars (USD $255,000.00) (the "Purchase Price"). This is a private transaction between the Seller and the Purchaser.

1.02 <u>Escrow Agent</u>. The Seller and the Purchaser hereby appoint David L. Hill, II on behalf of Hill Innovative Law, LLC, to act as the Escrow Agent as to the distribution of the Purchase Price received for the sale of the Shares and distribution of the Documents of to be held in the Escrow Account.

1.03 <u>Deposit; Due Diligence</u>. The Purchaser has made a deposit (the "Deposit") in the amount of Fifty-One Thousand, Five Hundred U.S. dollars (USD $51,500) for the Shares being sold by the Seller. The amount of $51,500 includes $1,500, which is the Purchaser's portion of the Escrow fee. The amount deposited will be held in the Escrow Account until Closing (as defined in Section 3.01 of this SPA) or until ordered released as per other sections of this SPA.

The Deposit shall be fully refundable for a period of ten (10) business days from the date of this SPA for any reason or no reason (the **"Due Diligence Period"**). After the Due Diligence Period, the Deposit will be non-refundable unless the Seller fails to fulfill all things to be completed

1

pursuant to the terms of this SPA and outlined in Article II, Section 2.15 and Article III, Section 3.02 of this SPA. In addition if, after signing this SPA and prior to the Closing, in performing due-diligence, the Purchaser, discovers something of significance that was not previously revealed that changes the structure and intent of this SPA and this transaction, the Purchaser will notify the Seller of the subject of its concern and their intention to cancel this SPA and the request for the refund of the Deposit, in writing, addressed to the individuals and addresses listed in Article VI, Section 6.09 of this SPA. The Seller shall have three business (3) days after receiving any such notice to correct the discrepancy, to the extent correctable, to the reasonable satisfaction of the Purchaser or the Deposit will be refunded to the Purchaser by the Escrow Agent.

The account wire instructions for the Deposit herein and payment pursuant to Sections 1.04 and 3.02(b)(i) are as follows:

The amount of Fifty-one Thousand, Five Hundred U.S. dollars ($51,500) of the Deposit was wire transferred into the following Escrow Account:

**International:**

| | |
|---|---|
| SWIFT Code: | WFBIUS6S |
| Recipient Bank Name: | Wells Fargo |
| Recipient Bank Address: | 420 Montgomery Street |
| | San Francisco, CA 94104-1207 |
| Account number: | 4978401370 |
| Credit to or Recipient Name: | Ameris Bank |
| Special Instructions or Recipient Reference: | David L Hill Attorney at Law IOLTA; |
| Account #: | 5075386 |

As soon as reasonably practicable after signing this SPA, Seller will grant to Purchaser, and/or Purchaser's Representative, access to the Google Drive containing of the corporate documents of the Company that are available, for review by the Purchaser, and any and all other documents of the Company which Purchaser might request.

1.04   <u>Balance of Purchase Price, Termination prior to Closing</u>. It is agreed that the full amount of the Purchase Price will be wire transferred to the Escrow Account on or before February 7, 2024, and that the closing will take place contemporaneous with such payment (the "**Closing**"). It is agreed that all of the Shares and the Documents shall remain in the Escrow Account until the full amount of the Purchase Price has been paid into Escrow Account, after which the Closing on the sale of the Shares shall take place and all stock certificates, stock powers and corporate documents listed in Article II, Section 2.15 and Article III, Section 3.02 below, and the full amount of the Purchase Price shall be disbursed in accordance with the terms of the Escrow Agreement.

In addition to the termination provision set forth in Section 1.03 above, this SPA may be terminated prior to the Closing (i) unilaterally by Seller if: (a) the balance of the Purchase Price for the Shares is not paid in full on or before February 7, 2024, unless an extension of time is agreed to in writing by both parties; or (b) Purchaser has failed to comply with all material terms of this SPA; and (ii) unilaterally by Purchaser if: (a) the Seller has failed to comply with all material terms of this SPA; or (b) the Documents from the Seller and the Company are not delivered to the Purchaser or Purchaser's representative on or before February 5, 2024, unless an extension of time is agreed to in writing by both parties.

Upon such termination of this SPA pursuant to clause (i) above, all consideration paid by Purchaser and Documents shall be delivered to Seller in accordance with the terms of the Escrow

Agreement. Upon such termination of this SPA pursuant to clause (ii) above, all consideration paid by the Purchaser shall be wired back to the Purchaser and all Documents shall be delivered to the Seller in accordance with the terms of the Escrow Agreement.

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

The Seller represents and warrants to and covenants with the Purchaser that as of the date of this SPA and as of the date of the Closing:

2.01    Organization. The Company is a Nevada corporation duly organized, validly existing, and in good standing under the laws of that state, has all necessary corporate powers to own properties and carry on a business, and is duly qualified to do business and is in good standing in the state of Nevada and elsewhere (if required). The Seller believes that all actions taken by the incorporators, directors and/or shareholders of the Company have been valid and in accordance with the laws of the state of Nevada. The Company reports to OTC Markets (Pink sheets) and is current in its reporting.

Immediately following the Closing, the Purchaser shall file all required filings with any state and federal regulators, including the OTC Markets Group Inc. (the "**OTC**"), disclosing the acquisition of the Shares by the Purchaser, the change of control of the Company, all changes to the officers and directors, and all such additional disclosure as is required to keep the Company in good standing with any and all regulatory bodies having authority.

2.02    OTC Markets Alternative Reporting Status/OTCPink. The Company is an OTC Alternative Reporting company and is required to file periodic reports with the OTC.

(a) To the best knowledge of the Seller the Company is a not a "shell" company (as such term is defined in Rule 12b-2 under the Exchange Act).

(b) To the best knowledge of the Seller, the Company is eligible to submit a Form 211 under SEC Rule 15c2-11 if required for brokers to publish competing quotes and provide continuous market making.

(c) The Company's common stock is DTC-eligible to the best of knowledge of the Seller. DTC has not taken and will not take action to impose directly and/or indirectly a "**chill**" or other restrictions on the common stock.

(d) The Company is preparing its federal and state tax returns for the years ended on December 31, 2023 and 2022.

(e) To the best knowledge of the Seller: (1). All of the Company's outstanding common stock and preferred stock have been legally issued in accordance with state and federal law and were approved by the board of the Company; (2). There are no liabilities or judgments against the Company, other than those included in the Company's financial statements and reports filed with OTC.

2.03    Authorization; Enforcement; Validity. The Seller has all requisite power, authority and legal capacity to enter into and perform his obligations under this SPA, the Escrow Agreement and each of the other agreements to be entered into by the Seller in connection with the transactions contemplated by this SPA (collectively, the "**Transaction Documents**"). The execution, delivery

and performance of the Transaction Documents by the Seller and/or the Company, if it is a corporation, and the consummation by the Seller of the transactions contemplated thereby, has been duly authorized by the board of directors of the Company and the Seller and no further consent or authorization is required by the Seller or the Company's board of directors or its stockholders. This SPA and all the other Transaction Documents have been duly executed and delivered by the Seller and constitute the legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms.

2.04    <u>Capitalization.</u>

    (a)    The authorized capital stock of the Company consists of 195,000,000 shares of Common Stock, $0.001 par value, of which 108,367,902 shares of Common Stock are issued and outstanding as of December 31, 2023. All outstanding common stocks are fully paid and non-assessable, free of liens, encumbrances, options, restrictions and legal or equitable rights of others not a party to this SPA. At the Closing, there will be no outstanding subscriptions, options, rights, warrants, convertible securities, or other agreements or commitments obligating the Company to issue or to transfer from treasury any additional common stocks of its capital stock.

    (b)    In addition, the authorized capital stock of the Company consists of 1,000,000 shares of Preferred Stock, $0.001 par value, of which no shares are issued and outstanding as of December 31, 2023. At the Closing, there will be no outstanding subscriptions, options, rights, warrants, convertible securities, or other agreements or commitments obligating the Company to issue or to transfer from treasury any additional preferred stocks of its capital stock.

    (c)    There are 521 shareholders of record of the Company plus shares in street name, if any. It is believed by the Seller that all of such shareholders have valid title to such shares and acquired their shares in a lawful transaction and in accordance with Nevada corporate law and the applicable securities laws of the United States and their respective states of residence.

2.05    <u>Financial Statements.</u>  The financial statements of the Company included in its Reports to OTC Markets are unaudited and have been prepared in accordance with the rules and regulations of GAAP and the SEC and fairly present the financial condition and operating results of the Company as of the Closing, and for the periods, indicated therein.

2.06    <u>Filings with Government Agencies, OTC Markets.</u>  The Company reports to OTC, and files periodic reports with OTC Markets. The Company is quoted on OTC Markets under the symbol FBSE. The Company has filed all required reports with OTC Markets and is current in its filings.

The Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the OTC pursuant to the reporting requirements of the OTC (all of the foregoing filed prior to the Closing together with all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein, all amendments thereto and all schedules and exhibits thereto and to any such amendments being hereinafter referred to collectively as the "OTC Documents"). All of the OTC Documents are available on the OTC's website: https://www.otcmarkets.com/stock/FBSE/disclosure. To the best of knowledge of the Seller, as of the Company's respective filing or effective dates, as applicable, the OTC Documents complied in all material respects with the requirements of the rules and regulations of the OTC.

As of their respective filing and effective dates, as applicable, none of the OTC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

2.07    Subsidiaries.  The Company does not own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.  The Company is not a participant in any joint venture, partnership or similar arrangement.

2.08    Liabilities.  Except as set forth in the Financial Statements included in the Company's Quarterly Report for the quarter ended September 30, 2023 (the "Quarterly Report"), the Company has no liabilities (contingent or otherwise).  Notwithstanding the foregoing, the Company shall not, as of the Closing, have any debt, liability, or obligation of any nature, whether accrued, absolute, contingent, or otherwise that will not be paid, cancelled or forgiven at the Closing unless agreed to by the Parties in writing.

2.09    Litigation.    To the best of knowledge of the Seller, neither the Seller nor the Company is a party to any direct and/or indirect litigation, arbitration and/or other proceedings and the Seller are not aware of any pending, threatened or asserted claims, lawsuits or contingencies involving the Seller and/or the Company or any of their respective assets, including without limitation, in the case of the Seller and the Shares.  There is no dispute of any kind between the Seller and/or the Company and any third party.  Neither the Seller nor the Company is party to any suit, action, arbitration, or legal administrative or other proceeding, or pending governmental investigation.  To the best of knowledge of the Seller, there is no basis for any such action or proceeding and no such action or proceeding is threatened against the Seller and/or the Company. Neither the Seller nor the Company is party to or in default with respect to any order, writ, injunction, or decree of any federal, state, local, or foreign court, department, agency, or instrumentality.

2.10    Tax Returns.  The Company is preparing its federal and state tax returns for the years ended on December 31, 2023 and 2022 before the Closing.  As of Closing, there shall be no taxes of any kind due or owing for the years ended on December 31, 2023 and 2022, respectively, and before.

2.11    No Conflicts.  The execution and delivery of this SPA and the other Transaction Documents by the Seller and the performance by the Seller of its obligations hereunder and thereunder will not cause, constitute, or conflict with or result in (a) any breach or violation or any of the provisions of or constitute a default under any license, indenture, mortgage, charter, instrument, articles of incorporation, bylaw, or other agreement or instrument to which such Seller, the Company or the directors and officers of the Company are a party, or by which they or their respective assets may be bound, nor will any consents or authorizations of any party other than those hereto be required, (b) an event that would cause the Seller and/or the Company to be liable to any third party; or (c) an event that would result in the creation or imposition of any lien, charge, or encumbrance on any asset of the Company or upon the Seller' Shares.

2.12    Contracts, Leases and Assets.    The Company is not a party to any contract, agreement, or lease (unless such contract, agreement or lease has been assigned to another party or the Company has been released from its obligations thereunder) other than the normal contract with the Transfer Agent.  No person holds a power of attorney from the Company or the Seller.  At the Closing, the Company will have no assets or liabilities or any obligations, which would give rise to a liability in the future.

2.13 <u>Compliance with Laws.</u> To the best of knowledge of the Seller, the Company has complied in all material respects, with, and is not in violation of any, federal, state, or local statute, law, and/or regulation. To the best of the knowledge of the Seller, the Company has complied with all federal and state securities laws in connection with the offer, sale and distribution of its securities in the United States and has filed all reports required to be filed with OTC Markets. The Shares being sold by the Seller to the Purchaser hereunder are being sold in a private transaction between the Seller and the Purchaser exempt from the registration requirements of the Securities Act.

2.14 <u>Conduct of Business.</u> Prior to the Closing, the Company shall conduct its business in the normal course, and shall not (without the prior written approval of Purchaser): (a) sell, pledge, or assign any assets; (b) amend its Certificate of Incorporation or Bylaws; (c) declare dividends, redeem or sell stock or other securities; (d) incur any liabilities, except in the normal course of business, which liabilities will be paid, cancelled or forgiven at or prior to Closing; (e) acquire or dispose of any assets, enter into any contract, guarantee obligations of any third party; (f) enter into any other transaction; or (g) enter into an agreement to do any of the foregoing.

2.15 <u>Corporate Documents.</u> Each of the following documents, which shall be true, complete and correct in all material respects, will be submitted to Purchaser prior to Closing:

Certificate of Incorporation and all amendments thereto;

Bylaws and all amendments thereto;

Minutes and Consents of Shareholders;

Minutes and Consents of the board of directors;

List of officers and directors;

Current shareholder list from the Transfer Agent;

Certificate of Good Standing from the Secretary of State of Nevada;

Copies of the Company's agreements with its transfer agent, legal counsel, auditor and Edgar filing agent if, in each case, the terms of such agreement require the Company to pay any amount if it elects to terminate such agreement or it is making installment payments;

Copies of agreements relating to any and all debt and liabilities that were cancelled, paid or forgiven;

Copies of tax returns of the Company submitted to IRS for the years ended on December 31, 2023 and 2022 and

All accounting records, worksheets and books and statements relating thereto, and

Officer's Certificate representing that the Company has no subsidiaries or an agreement to spin off or dispose of all subsidiaries owned prior to Closing whether or not they have been properly disclosed on various filings.

All minutes, consents or other documents pertaining to the Company to be delivered at or before the Closing pursuant to this **Section 2.15** shall be valid and in accordance with the laws of Nevada.

2.16    Title. The Seller have good and marketable title to all of the Shares being sold by the Seller to the Purchaser pursuant to this SPA, and upon payment of the applicable portion of the Purchase Price therefore, Purchaser will receive good and marketable title to such Shares subject only to such liens thereon as may be created by Purchaser. Such Shares will be, at the Closing, free and clear of all liens, security interests, pledges, charges, claims, encumbrances and restrictions of any kind, except for restrictions on transfer imposed by federal and state securities laws. None of such Shares are or will be subject to any voting trust or agreement. No person holds or has the right to receive any proxy or similar instrument with respect to such Shares. Except as provided in this SPA, such Seller are not a party to any agreement which offers or grants to any person the right to purchase or acquire any of such Shares. There is no applicable local, state or federal law, rule, regulation, or decree which would, as a result of the purchase of such Shares by Purchaser (and/or assigns) impair, restrict or delay voting rights with respect to such Shares.

2.17    Transfer of Shares.

(a) The Seller shall have the responsibility for sending all certificates representing the Shares being sold by the Seller to the Purchaser pursuant to this SPA, along with the medallion signature guaranteed or notarized stock powers acceptable to the Transfer Agent of the Company, to the Escrow Agent for delivery to the Purchaser at Closing.

(b) The Purchaser will have the responsibility of sending the certificates, along with the medallion signature guaranteed or notarized stock powers acceptable to the Transfer Agent of the Company to have the certificates transferred into its name and the Purchaser shall be responsible for all costs involved in such transfers. Notwithstanding the foregoing, the Seller shall cooperate in furnishing the Purchaser with any additional information or documents required by the Transfer Agent to affect such transfer.

2.18    Representations. All representations shall be true as of the Closing and all such representations shall survive the Closing.

## ARTICLE III
## CLOSING DELIVERIES

3.01    Closing for the Purchase of 79,966,961 Common Stock. The Closing (the "Closing") of this transaction for the Shares being purchased by the Purchaser will occur when all of the Documents and consideration described in Section 2.15 above and in 3.02 below, have been delivered or other arrangements have been made and agreed to by the Parties. If the Closing does not occur on or before February 7, 2024, then either party may terminate this SPA upon written notice.

This SPA can be terminated by either party as described in Section 1.03 above.

3.02    Documents and Payments to be delivered at Closing. As part of the Closing of the SPA, those documents listed in Section 2.15 of this SPA, as well as the following documents, in form reasonably acceptable to counsel to the Parties, shall have been delivered to Escrow Agent at least 48 hours prior to the Closing:

(a)    By the Seller:

7

(i)     stock certificate or certificates, along with medallion signature guaranteed or notarized stock powers acceptable to the Transfer Agent of the Company, representing the Shares, endorsed in favor of the name or names as designated by Purchaser or left blank, and such corporate authorization as may be required.

(ii)    the resignation of all officers of the Company and the appointment of new officers as designated by the Purchaser.

(iii)   the resignations of all directors of the Company and the appointment of new directors as designated by the Purchaser.

(iv)   the board resolution of the Company to authorize the officer of the Seller to enter into this SPA.

(v)    true and correct copies of all of the business and corporate records of the Company, including but not limited to correspondence files, bank statements, checkbooks, savings account books, minutes of shareholder and director's meetings or consents, financial statements, shareholder listings, stock transfer records, agreements, tax returns and contracts that exist.

(vi)   true and correct copies of the original stock purchase agreements or other document(s) pursuant to which the Seller acquired such Seller' Shares.

(vii)   copies of tax returns for the years ended on December 31, 2023 and 2022 that the Company submits to IRS.

(viii)   Officer's Certificate representing that the company has no subsidiaries or an agreement to spin off or dispose of all subsidiaries owned prior to Closing whether or not they have been properly disclosed on various filings.

(ix)   such other documents and records of the Company as may be reasonably required by the Purchaser, if available.

(b)   By Purchaser:

(i)    wire transfer to the Escrow Account the amount of Two Hundred and Five Thousand U.S. dollars (USD $205,000.00) representing the balance of the Purchase Price for the Shares.


# ARTICLE IV
## INVESTMENT REPRESENTATIONS AND WARRANTIES AND COVENANTS OF THE PURCHASER

The Purchaser represents warrants and covenants to the Seller the following:

4.01  <u>Investment Intent.</u>  The Purchaser is acquiring the Shares for its own account for investment, and not with a view toward distribution thereof.

4.02  No Advertisement.  The Purchaser acknowledges that the Shares have been offered to the Purchaser in direct communication between the Purchaser and the Seller, and not through any advertisement of any kind.

4.03  Knowledge and Experience.  The Purchaser acknowledges that he has have been encouraged to seek his own legal and financial counsel to assist him in evaluating this purchase. The Purchaser acknowledges that Seller has given the Purchaser and his attorney and advisor access to all information relating to the Company's business that they or any one of them have requested. The Purchaser acknowledges that he has sufficient business and financial experience, and knowledge concerning the affairs and conditions of the Company so that he can make a reasoned decision as to this purchase of the Shares and is capable of evaluating the merits and risks of this purchase.

4.04  Future Business of the Company.  The Purchaser represents that after the Closing of this transaction, the Purchaser will either carry on the existing business of the Company or vend in a legitimate business. After the Closing, the Purchaser covenants not to manipulate or participate in manipulating the share price of the Company in a "pump and dump" scheme.

4.05  Anti-Money Laundering, Anti-Corruption and Anti-Terrorism Laws.  The Purchaser confirms that the funds representing the Purchase Price will not represent proceed of crime for the purpose of any applicable anti-money laundering or anti-terrorist legislation, regulation or guideline and the Purchaser is in compliance with, and has not previously violated, the United States of America Patriot Act of 2001, as amended through the date of this SPA (the "Patriot Act"), to the extent applicable to the Purchaser and all other applicable anti-money laundering, anti-corruption and anti-terrorism laws and regulations.

4.06  Representations.  All Representations shall be true as of the Closing and all such representations shall survive the Closing.

## ARTICLE V
## INDEMNIFICATION

5.01  Indemnification.  From and after the Closing, the Seller agrees to indemnify the Purchaser, and the Purchaser agrees to indemnify the Seller, against all actual losses, damages and expenses caused by (a) any material breach of this SPA by the indemnifying Party or any material misrepresentation by the indemnifying Party contained herein; or (b) any misstatement of a material fact or omission to state a material fact by the indemnifying Party required to be stated herein or necessary to make the statements herein not misleading.

5.02  Indemnification Non-Exclusive.  The foregoing indemnification provision is in addition to, and not derogation of any statutory, equitable or common law remedy any Party may have for breach of representation, warranty, covenant or agreement.

5.03  Survival.  All representations and warranties of the Parties made hereunder shall be true as of the date of Closing and shall survive the Closing.

## ARTICLE VI
## MISCELLANEOUS

6.01  Captions and Headings.  The article and paragraph headings throughout this SPA are for convenience and reference only, and shall in no way be deemed to define, limit, or add to the meaning of any provision of this SPA.

6.02    No Oral Change.  This SPA and any provision hereof, may not be waived, changed, modified, or discharged, orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought.

6.03    Non Waiver.  Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this SPA shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this SPA or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this SPA to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

6.04    Time of Essence.  Time is of the essence of this SPA and of each and every provision hereof.

6.05    Entire Agreement.  This SPA, including any and all attachments hereto, and including the Escrow Agreement, contains the entire Agreement and understanding between the parties hereto, and supersede all prior agreements and understandings.

6.06    Partial Invalidity.  In the event that any condition, covenant, or other provision of this SPA is held to be invalid or void by any court of competent jurisdiction, it shall be deemed severable from the remainder of this SPA and shall in no way affect any other condition, covenant or other provision of the SPA.  If such condition, covenant, or other provision is held to be invalid due to its scope or breadth, it is agreed that it shall be deemed to remain valid to the extent permitted by law.

6.07    Counterparts.  This SPA may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile signatures will be acceptable to all parties.

6.09    Notices.  All notices, requests, demands, and other communications under this SPA shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the third day after deposit with a recognized overnight courier, if prepaid and duly addressed to the party to whom notice is given.

If to the Seller and Company:

Rasmus Refer, President
Fastbase Inc.
140 Broadway, 46th Floor
New York, New York 10005

With a copy to Seller's Attorney

Scott Doney, Esq.
The Doney Law Firm
4955 S. Durango Rd., Ste 165
Las Vegas, NV 89113

10

If to the Purchaser:

Chong Yi Yang
Trump Bldg., 29th Floor
40 Wall Street
New York, NY 10005

With a copy to Purchaser's Attorney

William B. Barnett, Esq.
Barnett & Linn
60 Kavenish Drive
Rancho Mirage, CA 92270

6.10    Binding Effect.    This SPA shall inure to and be binding upon the heirs, executors, personal representatives, successors and assigns of each of the parties to this SPA.

6.11    Effect of Closing.    All representations, warranties, covenants, and agreements of the parties contained in this SPA, or in any instrument, certificate, opinion, or other writing provided for in it, shall be true and correct as of the Closing and shall survive the Closing of this SPA.

6.12    Mutual Cooperation.    The parties hereto shall cooperate with each other to achieve the purpose of this SPA and shall execute such other and further documents and take such other and further actions as may be necessary or convenient to effect the transaction described herein.

6.13    Governing Law. This SPA and the rights of the Parties hereunder shall be governed by and construed in accordance with the Laws of the State of Nevada (regardless of its conflict of laws principles), including all matters of construction, validity, performance, and enforcement and without giving effect to the principles of conflict of laws.

6.14    Exclusive Jurisdiction and Venue.    The Parties agree subject to the Courts of the State of Nevada shall have sole and exclusive jurisdiction and venue for the resolution of all disputes arising under the terms of this SPA and the Transactions contemplated herein.

6.15    Attorneys Fees.    In the event any Party hereto shall commence legal proceedings against the other to interpret, enforce or otherwise arising from this SPA, the prevailing Party in any such proceeding shall be entitled to recover from the non-prevailing Party its costs of suit, including reasonable attorneys' fees and costs, at both the trial and appellate levels.

[Signatures on Following Page]

11

**IN WITNESS WHEREOF,** this SPA has been duly executed by the Parties hereto as of the date first written above.

**SELLER:    Rasmus Refer**

BY: _____

Rasmus Refer, an individual

**COMPANY: Eastbase Inc.**

By _____

Rasmus Refer, President

**PURCHASER:   Chong Yi Yang**

By: _____

Chong Yi Yang, an individual

12